CHARLES O. RICKUS, APPELLEE AND CROSS-APPELLANT, V.
RENA IRENE RICKUS, APPELLANT AND CROSS-APPELLEE.

158 N. W. 2d 540

Filed May 3, 1968. No. 36732.

Wright, Simmons & Hancock, for appellant.

Lovell & Raymond, for appellee.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

SPENCER, J.

Charles O. Rickus, hereinafter referred to as plaintiff, and Rena Irene Rickus, hereinafter referred to as defendant, filed separate actions on June 29, 1965, praying for absolute divorces. The actions were consolidated by order of the court into the one filed by the plaintiff, which was the first one filed. The plaintiff later filed an amended petition to which the defendant filed an answer and a cross-petition.

Plaintiff alleged that the parties owned real estate and personal property in their joint names which had been acquired through the sole efforts of the plaintiff, most of which had been accumulated prior to the marriage, and prayed that all such property be quieted in him. Defendant alleged that she had substantial property at the time of the marriage which had enhanced the

joint property of the parties, and prayed for restoration of the property she had at the time of the marriage, together with a share of the property accumulated during the marriage.

The parties were married July 12, 1963. Their marriage of less than 2 years was a very turbulent one. During that period the parties lived together as husband and wife for less than a year. Plaintiff filed a petition for divorce January 4, 1964. The parties were separated for 60 days or longer, and then resumed marital relations. The plaintiff filed a second petition June 26, 1964. The defendant had moved back to Sheridan, Wyoming, in May 1964, and did not return to Scottsbluff until the middle of September 1964, at which time the parties again resumed marital relations. On November 3, 1964, the defendant filed a petition for divorce and the parties did not resume marital relations until April 1, 1965, and, as stated, both parties filed separate divorce actions on June 29, 1965.

This was the plaintiff's second marriage and the defendant's fourth or fifth. The defendant failed to answer an interrogatory as to her previous marriages. The complaint in the divorce action in defendant's last marriage alleges she had been married at least four times. The decree in defendant's last divorce was filed September 28, 1962. Plaintiff married defendant soon after his first divorce decree became final.

It will serve no useful purpose to detail the evidence adduced in the six-volume record herein. Plaintiff's original petition alleged extreme cruelty, and the amended petition alleged extreme cruelty and adultery. Defendant alleged extreme cruelty, both mental and physical.

The Saturday night before the petitions were filed herein, the parties had a violent argument and the plaintiff struck the defendant. While plaintiff's provocation may have been great, this does not excuse him. Ordinarily, acts of personal violence by the husband toward

his wife are not justified by conduct on the part of the wife that does not threaten bodily harm. Humann v. Humann, 180 Neb. 719, 144 N. W. 2d 723. Plaintiff admits he slapped the defendant, and alleges she ran into the bathroom and slipped, at which time she may have bruised her left side. He went in to pick her up and she screamed, which brought her daughter to the scene. Defendant alleged plaintiff knocked her down and kicked her in the left side. We do not deem it necessary to discuss this incident further, other than the reference hereafter to defendant's alleged injuries.

The record amply sustains the plaintiff's allegation that the defendant continually called him vile and obscene names and held him up to ridicule. The record, except for the fact that the trial court who observed the witnesses did not so find, would sustain the allegation of adultery. In any event, it can be said that the record does sustain a finding of extreme indiscretion on the part of the defendant.

Defendant questions the sufficiency of the corroboration to support a decree for plaintiff. It is impossible to lay down any general rule as to the degree of corroboration necessary in a divorce action as each case must be decided on its own facts and circumstances. Applegate v. Applegate, 182 Neb. 342, 155 N. W. 2d 337. We find the corroboration sufficient herein.

Defendant argues that the acts of cruelty testified to by plaintiff's witnesses were condoned when the parties resumed marital relations after a reconciliation agreement in March 1965. Condonation is dependent upon future good conduct and a repetition of the offense revives the wrong condoned. Fletcher v. Fletcher, 182 Neb. 549, 156 N. W. 2d 1. On the record herein, we find there was no condonation.

Defendant at the time of the marriage owned a residence in Sheridan, Wyoming, which she sold during the marriage for $12,000. At the time of the sale the balance due on the purchase money mortgage was $7,352.88.

The sale expense was $1,418.51. The proceeds were put into bonds which defendant testified she later cashed and used during the marriage.

Defendant had two teen-age children by a previous marriage. These children lived with the parties but were not adopted by the plaintiff. Defendant at the time of the marriage was receiving child support in the amount of $100 a month from the father of the children. This subsequently was increased to $150 a month.

One of defendant's chief contentions is that she had $18,000 in cash at the time she married the plaintiff, much of which she loaned to the plaintiff at various times before the fall of 1964. She testified she kept this $18,000 in a locked suitcase in her bedroom, and that no one, including the plaintiff or her children, had ever seen it. She further testified that she had never used a bank until she borrowed $150 from the First National Bank at Scottsbluff on June 26, 1964. Her testimony on having $18,000 in cash at the time of her marriage at the very least puts a severe strain on credulity.

Defendant testified that she had this $18,000 in cash when she divorced her previous husband, but that it was not considered in the divorce because he had no claim to it. Defendant married that husband June 7, 1960. The divorce petition was filed by the husband but the parties entered into a property settlement, and by agreement the decree was entered on the defendant's cross-petition. It is of interest to note that the former husband alleged that the defendant had liabilities which she failed to disclose until after the marriage. In answer to an interrogatory in that action, the defendant stated as follows: "* * * Plaintiff has not been asked to pay any of Defendant's debts due and owing prior to marriage as all said debts that accrued prior to marriage were totalled and money borrowed from Pacific Finance, and were paid off with child support checks received from Warren Gilbert. The Defendant is merely

requesting that all present bills that were incurred during the marriage to Plaintiff be paid by Plaintiff."

Plaintiff testified his wife told him before the marriage that she was without funds and was having difficulty meeting her obligations, and that he gave her money to help on expenses. The day after the marriage plaintiff gave her $1,500 for repairs on her Sheridan, Wyoming, house. Defendant admits receiving this $1,500, but alleges it was to pay back money she had loaned him. Defendant also admits that the plaintiff paid off a furniture loan of approximately $700 to the Pacific Finance Company in Sheridan, Wyoming, so that she could move her furniture to Scottsbluff, Nebraska, as well as paying her moving expenses. The evidence is undisputed that from the time she moved to Scottsbluff, which was in January 1963, until the marriage on July 12, 1963, plaintiff gave defendant $125 each week for expenses.

Defendant's story is that plaintiff would come to her, usually on Saturday morning, needing money to meet his payroll, and she would give him between six and seven hundred dollars. She also told of an instance when she alleged she loaned plaintiff $3,000 cash to make a payment on equipment. She testified that on this occasion she demanded a receipt after she had given him the money; that he threw it back at her; and that she picked up the money and returned it to her suitcase. Plaintiff later came back and she again gave him the money when he told her he would make out a receipt after he had made the payment. Defendant testified: "I paid cash and I have receipts for every dime I have ever spent all my life," but she never secured any receipts for any of the money she claims she advanced to the plaintiff.

When defendant was asked how she knew she had $18,000 at the time of her marriage to plaintiff, she said: "Because I am a miser, for one thing, and I know where every penny I spend goes." However, she kept no record of this $18,000 because, as she said, it "wasn't supposed

to have been used." During the trial defendant referred to day-to-day notations on calendars she kept through the years, but these calendars had no notations as to any alleged loans. If defendant's testimony is to be believed, she loaned her husband approximately $18,000 during the first year of their marriage. During this period two divorce petitions were filed by the plaintiff, and the parties were separated at least 2 months before the defendant moved back to Sheridan, Wyoming, in May 1964. Further, when the parties discussed a divorce settlement with their attorneys in November 1964, no contention was made by defendant that she had ever loaned plaintiff any money which she wanted back out of the marriage.

Plaintiff denies ever borrowing money from the defendant. He denies ever paying any of his employees in cash or making cash payments on equipment purchases. This testimony is corroborated by his records. His accountant testified that the records indicate that plaintiff's employees were always paid by check and never by cash, and that no cash payments were ever made on any equipment purchases. Plaintiff's deposit slips were also produced for the period of the marriage and there are no unexplained cash deposits.

Defendant's testimony on the extent of the injuries she received during the altercation with her husband on June 26, 1965, also strains credulity. Doctor Gentry, who saw her that evening, testified to some contusions on the left side of her head and chest. He put an Ace bandage on her chest. This bandage is in evidence. An X-ray was negative for any fractures. Defendant testified she wore the Ace bandage, night and day until she consulted Doctor Baker on July 13, 1965. She testified that Doctor Baker at that time prescribed a new brace or harness which she wore night and day for 5 or 6 months, even wearing it to bed. This harness also is in evidence. Doctor Baker testified that he never prescribed a harness or brace for defendant, and that he

has no recollection of her ever wearing one. It is apparent from an inspection of the harness allegedly prescribed by Doctor Baker that it has never been worn, not even for 1 hour. The Ace bandage prescribed by Doctor Gentry may have been worn an hour or two, but certainly it could not have been worn night and day from June 26 to July 13, 1965. It shows absolutely no evidence of any wear except for the briefest period, has no soil marks, and has never been washed.

The credibility gap in defendant's testimony is so great in so many particulars and the contradictions so many that we are unable to discern from the record before us when she may have been testifying truthfully. On appeal to the Supreme Court in a divorce action the cause is for trial de novo. Kuta v. Kuta, 180 Neb. 443, 143 N. W. 2d 751. In spite of the unreliability of the defendant's testimony, we accept the finding of the trial court on the incident at Lake Minatare on which plaintiff based his allegation of adultery. As suggested heretofore, however, the evidence does justify a finding of extreme indiscretion on the defendant's part. We also note that defendant admits having dinner with a gentleman friend on at least one occasion in a Melbeta bar, and admits that they visited frequently. We accept plaintiff's version of the altercation on June 26, 1965, and while we do not condone his action, in view of his provocation we do not find it sufficient to deny him a divorce.

We do not deem it necessary to discuss the transfers of property made by plaintiff to meet defendant's demands. The record herein would indicate that from the first defendant never seriously endeavored to make a success of this marriage. She testified she married plaintiff only because he threatened her with a breach of promise action. After the marriage she was reluctant to use her married name, Rickus, but continued in many instances the use of the name Gilbert. She borrowed money on the rings plaintiff had given her, not because she needed money but, as she testified: "Actually, I

didn't want the rings." On the other hand, to the date of the final altercation, June 26, 1965, plaintiff's accessions to the demands of the defendant would indicate he was doing everything possible to save the marriage. We sustain the finding of the trial court in granting a divorce to the plaintiff and dismissing defendant's cross-petition.

The trial court was overly generous with the defendant. She had a $50 per week temporary alimony allowance from July 14, 1965, to the date of the trial, or $5,050. Plaintiff was additionally required to keep up the payments on the house in which the defendant was living. Defendant also was allowed $50 temporary attorneys' fees, and $333.50 for court costs and expenses. In the final decree, defendant was awarded $7,500 permanent alimony, $700 attorneys' fees, and plaintiff was required to pay $1,140.63 in obligations incurred by her subsequent to the separation of the parties.

On the record, $2,000 is a very generous permanent alimony allowance for defendant to be paid as directed by the trial court, and the judgment of the trial court is modified to that extent. In all other respects the judgment is affirmed as modified. Defendant's attorneys are allowed $750 for services in this court, to be taxed as costs.

AFFIRMED AS MODIFIED.